# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 1904 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued defendant for discriminating and retaliating against her in violation of 28 U.S.C. §§ 1981 and 1983, Title VII and state law. The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants the motion as to the federal claims plaintiff asserts in Counts I, II and V and declines to exercise supplemental jurisdiction over the state law claims she asserts in Counts III and IV.

## Facts

In 2000, defendant hired plaintiff, who is African American, as executive assistant for office administration for its Office of the Inspector General ("OIG"). (Pl.'s LR 56.1 (b)(3)(C) Stmt. ¶ 1; Pl.'s App., Tab C, Ex. 29, 2000 Performance Review Page ID# 1375.) At the time, Laurie Barsella was the Inspector General ("IG") and she allowed plaintiff, who was simultaneously enrolled in college, to vary her start time to accommodate her class schedule. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 4.) In 2004, Alison Perona became IG. (PL.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.)

As office administrator, plaintiff was responsible for, among other things, administering OIG's petty cash fund. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 8.) In October 2005, plaintiff discovered that $85.00 was missing from the fund. (*Id.* ¶ 9.) According to Perona, the ensuing investigation revealed "substantial evidence of [plaintiff's] poor controls." (*See* Pl.'s App., Tab C, Ex. 10, Petty Cash Discrepancy – Oct. 2005.) Plaintiff says it showed that other employees made mistakes on their petty cash vouchers. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 10.)

Plaintiff was also OIG's timekeeper, which required her to create a biweekly attendance packet that documented the hours worked by OIG employees. (*Id.* ¶ 22.) She did so by reviewing the employees' arrival and departure times as recorded by the electronic identification card reader, their requests for time off and their notations on the office calendar. (*Id.*) If there were any gaps or inconsistencies in the card reader data, plaintiff noted them in an electronic exception review report, which she gave to Perona or Deputy IG Paul Sidrys for further investigation. (*Id.* ¶ 23.) Plaintiff contends that she was not required to document employees' late arrivals or early departures on this report but admits that she did so routinely until March 2007. (*Id.* ¶ 28.)

In 2005, plaintiff told Perona that she saw pornography on the computers of two OIG employees. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.) Perona "immediately addressed" these claims, but determined them to be unfounded. (Pl.'s App., Tab C, Ex. 36, Memo from Robinson to OIG Management (Mar. 23, 2006); Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.) On another occasion, plaintiff told Perona that an investigator had intimidated her by repeatedly refusing to review an invoice and, when he finally did so, throwing the invoice at her. (Pl.'s App., Tab E, Robinson Dep. 14-17.) Subsequently, Perona instructed all of the investigators via email to give plaintiff their cooperation. (*Id.* 17.)

2

In March 2006, Deputy IG Sidrys gave plaintiff a "meets expectations" rating for her 2005 performance. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12.) At about the same time, Perona told plaintiff, whose college course work was nearly done, that she needed to return to a regular schedule with a start time of 8:00 a.m. (*Id.* ¶ 13.)

On June 2, 2006, Perona sent an email to plaintiff noting that she had arrived twenty to thirty minutes late each day of the previous pay period and reminding her that her start time was 8:00 a.m. (*Id.* ¶ 14.) Plaintiff's response was: "I apologize for slacking off in my arrival time during the past pay period. In future assessments of my arrival/departure times, please consider that the building's security system, which is the master for the electronic reader that is immediately outside of the OIG, is ten minutes fast." (Pl.'s App., Tab C, Ex. 41, Email from Robinson to Perona (June 2, 2006).)

Subsequently, Perona asked building management about the master clock and was told that its accuracy was checked each day. (*Id.*, Ex. 15, Email from Perona to Robinson (June 15, 2006).) On June 15, 2006, Perona relayed that information to plaintiff and said:

> On June 2, you were re-advised that your working hours were 8-4:30. During the week of June 5, your log in times were: 8:10, 8:08, 8:14 and 7:48. The needs of the OIG dictate that its Office Administrator be present at 8:00 to handle work issues. Staying "late" to make up the time does not mitigate the loss of coverage at the beginning of the work day.
>
> To restate: Your working hours are 8-4:30.
>
> Take whatever measures are necessary to ensure that you are in the office at 8:00 a.m.

(*Id.*)

On March 21, 2007, Sidrys gave plaintiff a "meets expectations" rating for 2006. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 18.) Among other things, he said that plaintiff had "reduced the number of

late arrivals" but "should continue . . . to further reduce or eliminate tardiness." (Pl.'s App., Tab C, Ex. 37, 2006 Performance Evaluation CTA 000219.)

On April 9, 2007, plaintiff lost her employee identification card. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19.) The form for requesting a new one required Perona's signature. (*Id.*) Instead of getting Perona's signature, however, plaintiff signed Perona's name to the form and later told Perona that she had done so. (*Id.* ¶ 20.)

On April 11, 2007, Perona gave plaintiff a one-day, in-office suspension for having signed Perona's name without authorization to do so. (Pl.'s App., Tab C, Ex. 11, Memo from Perona to OIG Personnel File (Apr. 11, 2007).) The suspension notice states:

> Ms. Robinson did not have . . . permission to sign any documents on my behalf. . . . On April 9, there was ample opportunity to present me with the document for my signature or, in the alternative, contact me to request permission to sign my name. I was in the office from 8:30 to 4:00 (no external meetings; lunch at my desk). Ms. Robinson did not call or e-mail me regarding this matter. Ms. Robinson indicated that she stopped by my office once, but I was busy. She indicated that she stopped by after 4:00, but I had left the office.
>
> This is an unacceptable breach of trust and indicates poor judgment by Ms. Robinson. She has acknowledged that there was no immediate need for replacement of this card, other than for her own convenience. While the fact that she did immediately notify me of her actions may demonstrate that she did not have the intent to deceive, it also indicates that she knew how and had the ability to contact me about this matter.

(*Id.*)

On January 2, 2008, when plaintiff asked to take two vacation days, Perona discovered that she had already taken more vacation time than was allotted to her for the June 1, 2007-May 30, 2008 period. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25.) Perona also discovered that plaintiff had stopped recording her late arrivals and early departures on the electronic exception review report in March 2007. (*Id.* ¶ 28.) Since then, plaintiff had been sending emails to herself to document her arrival

4

times and attaching copies of them to the attendance packet, not the electronic exception review report. (*Id.* ¶¶ 29-30.) When Perona reviewed the data recorded by the electronic card reader from March through December 2007, she discovered that plaintiff had been late for work on at least two and as many as twenty days each month. (*See* Pl.'s App., Tab. C, Ex. 16, Robinson – Attendance Record 2007 CTA 000130.)

On January 15, 2008, Adele Kubiak, who is white, was hired by OIG. (Pl.'s App., Tab A, 11/14/08 Hr'g Tr. 96.)

On January 16, 2008, Perona reprimanded plaintiff for the vacation day error:

> At the beginning of January 2008, I performed an audit of [plaintiff's] vacation time for the 2006-2007 and 2007-2008 vacation cycles. During this review, it was determined that [plaintiff] had exhausted her vacation time for the 2006-2007 cycle and had received authorization to "borrow forward" six days from the 2007-2008 cycle in order to take time off prior to June 1, 2007. . . .
>
> It was also determined during this audit that, in her capacity as timekeeper for the Office of Inspector General, [plaintiff] failed to properly deduct 2 of the 6 "borrow forward" days from the 2007-2008 allotment. As a result, a vacation day taken on October 29, 2007 was improperly classified as a paid vacation day from the 2007-2008 cycle, rather than as an unpaid absence or approved as a "borrow forward" day.
>
> The matter was brought to [plaintiff's] attention, and she corrected the time accrual issues by receiving permission to "borrow forward" the appropriate number of days.
>
> Through her acts or omissions, [plaintiff] credited herself for paid time off when, in fact, she was not entitled to such time, resulting in the appearance of impropriety. It is vital that the OIG's timekeeper perform the duties with a minimum of errors and the utmost integrity.
>
> Therefore, this letter serves as a formal reprimand to [plaintiff] for her acts or omissions concerning these events.

(*Id.*, Tab G, Ex. 12, Memo from Perona to Personnel File (Jan. 16, 2008).)

On February 1, 2008, Perona reprimanded plaintiff for her late arrivals:

5

> As you are aware from previous discussions, based on the needs of the OIG, the hours for the position of Office Administrator are 8-4:30.
>
> In 2006, issues regarding your failure to meet the 8:00 arrival time were brought to your attention (frequent late arrivals of twenty minutes or more). You indicated that you would improve your attendance records.
>
> In comparing 2006 records to those of 2007, it is clear that while you have reduced the minutes by which you are tardy, the continuing amount of late arrivals raises serious concerns.
>
> You are hereby formally warned that you will be subject to discipline for any further tardiness. Effective February 1, 2008, all late arrivals must be immediately reported to the Inspector General and Deputy Inspector General by e-mail; this e-mail must contain an explanation of the reason for the late arrival. The IG and Deputy IG will review the incident and determine what, if any, discipline is appropriate.

(*Id.*, Ex. 14, Memo from Perona to Robinson (Feb. 1, 2008).)

Later that month, plaintiff received a bill for OIG's copy of the 2007 Sullivan's Law Directory, but not the directory itself. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.) Plaintiff told Perona that she had called the publisher about the invoice and was told that a new edition had not been published for 2007. (Pl.'s App., Tab A, 11/14/08 Hr'g Tr. 106.) Perona thought that was a dubious explanation and told plaintiff to investigate further. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.) After doing so, plaintiff told Perona that the 2007 edition had been published and OIG's copy of it had been sent to another department by mistake. (*Id.* ¶ 37.) Consequently, Perona told plaintiff that she needed to "pay attention to detail." (*Id.*)

The same day, plaintiff told Perona that OIG received a bill from Enterprise Rental Car that was $70.00 less than the parties' contract required. (*Id.* ¶ 38.) Plaintiff said she had asked Enterprise about the bill and was told that OIG was receiving a volume discount. (*Id.* ¶ 39.) Because OIG was renting only one car, Perona did not believe that explanation and told plaintiff to

6

check into it. (*Id.*) Ultimately, plaintiff determined that Enterprise had been sent the bill to OIG in error. (*Id.* ¶ 40.)

On February 19, 2008, Perona told Sidrys about the invoice issues and described plaintiff's actions as "inexcusable." (Def.'s App., Tab G, Ex. 21, Email from Perona to Sidrys (Feb. 19, 2008).)

On February 26, 2008, Perona asked plaintiff to report on OIG's use of color toner in 2006 and 2007, so Perona could decide whether OIG should buy a color copier. (Pl.'s LR 56.1(b)(3)(B) ¶ 50.) Plaintiff immediately acknowledged the request but did not provide the information until March 24, 2008. (*Id.* ¶¶ 50-51; Def.'s App., Tab G, Ex. 20, Email from Perona to Robinson (Mar. 12, 2008).)

On March 3, 2008, Perona discovered that plaintiff had not performed one of her tasks, asking OIG employees to identify and pay for personal calls made on their OIG cell phones, for months. (Pl.'s LR 56.1(b)(3)(B) ¶ 46.) When Perona asked her about it, plaintiff said she had put that task on a "slow track" because she had more pressing obligations. (*Id.* ¶ 47.)

On March 19, 2008, plaintiff submitted an OIG payroll document to Sidrys that incorrectly included payment to an employee who was on short-term disability leave. (*Id.* ¶ 42.) Though plaintiff corrected the error before payment was made, the next day, Sidrys reported it to Perona. (*Id.* ¶ 43; *see* Def.'s App., Tab G, Ex. 25, Email from Sidrys to Perona (Mar. 20, 2008) (stating that plaintiff had "missed 3 of [an employee's] sick days and had to recreate the [payroll] documents after I signed them.").)

On March 26, 2008, Perona discharged plaintiff. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54.) Because she thought plaintiff was an "at-will" employee, Perona gave plaintiff no reason for the

7

discharge. (*Id.* ¶¶ 54-55.) When defendant's human resources ("HR") department told Perona that plaintiff was not an at-will employee, Perona prepared a notice of termination that said plaintiff had failed to follow rules, orders and instructions, falsified statements, performed poorly, and unilaterally changed her working hours in violation of defendant's rules. (Def.'s App., Tab G, Ex. 3, Notice of Termination.)

## Discussion

To prevail on a summary judgment motion, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In Counts I and II and V, plaintiff alleges that defendant discharged her because of her race and in retaliation for her complaints of discrimination in violation of §§ 1981 and 1983 and Title VII, respectively. Plaintiff can survive summary judgment on her retaliation claim by offering direct evidence that she was terminated because she engaged in protected activity or evidence that she was terminated after engaging in protected activity and no other similarly situated employee who did not complain suffered the same fate. *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *see Humphries v. CBOCS W. Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (applying standards for Title VII retaliation claims to § 1981 retaliation claim); *Spiegla v. Hull*, 371 F.3d 928, 943 n.10 (7th Cir.

8

2004) ("[I]n this Circuit the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim." (quotation omitted))

The protected activities plaintiff cites are her alleged filing of an EEOC charge the day before she was terminated and her 2005 reports to Perona about the pornography and intimidation incidents. The EEOC charge cannot be the basis for a retaliation claim because there is no evidence that suggests Perona knew about it. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 73); *see Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006) ("It is not sufficient that an employer could or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory." (quotation omitted)).

The pornography and intimidation reports are equally unavailing. First, though plaintiff perceived these incidents as sexual harassment, it is not clear that she reported them as such to Perona, a requirement for protected activity. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 63-64; Def.'s App., Tab B, Robinson Dep. 11-16, 34-35); *see Tomanovich*, 457 F.3d at 663 (stating that internal complaints constitute protected activity only if they indicate a connection between the discrimination or harassment and the complainant's membership in a protected class). Second, even if she did, there is no evidence to suggest that there is a connection between her complaints and her termination. Indeed, the only reasonable inference that can be drawn from the few facts offered on this claim, that the complaints were made and addressed in 2005, is that plaintiff's complaints are wholly unrelated to the 2008 decision to terminate her. (*See* Def.'s Reply Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4; Def.'s App., Tab G, Ex. 36, Memo from Robinson to OIG Management (Mar. 23, 2006); Pl.'s App., Tab E, Robinson Dep. 15-17); *see also Tomanovich*, 457 F.3d at 656 ("This court has held a temporal connection of four months failed to establish a causal connection between a

protected activity and an adverse action."). Because there is no evidence to suggest that plaintiff's complaints and her termination are causally related, defendant is entitled to judgment as a matter of law on her retaliation claim.

Plaintiff fares no better with her discrimination claims. She can defeat defendant's motion on these claims by using: (1) the direct method of proof, *i.e.*, offering evidence of suspicious timing or ambiguous comments that suggest bias, showing that defendant gave "systematically better treatment" to similarly situated, non-white employees or was replaced by a non-white employee for incredible reasons; (2) or the indirect method proof, *i.e.*, showing that defendant terminated her, though she was meeting its legitimate performance expectations, but not a similarly-situated non-African-American employee, and gave an incredible reason for doing so. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719-21 (7th Cir. 2005) (quotation omitted); *see Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002) ("Discrimination claims under both Title VII and § 1981 are analyzed in the same manner."); *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (using the same analysis for claims under all three statutes).

Plaintiff contends that her claims survive under both methods because the record shows that defendant did not criticize her performance until Kubiak was hired, defendant disciplined plaintiff more harshly than white employees, Perona did not explain the reasons for plaintiff's discharge until HR forced her to do so and Kubiak assumed plaintiff's duties after she was fired.

The first contention is refuted by the undisputed evidence, which shows that: (1) Perona spoke to plaintiff about her tardiness in June 2006 and it was noted as an issue in plaintiff's 2006

performance review; (2) plaintiff stopped noting her late arrivals on the electronic exception review report in March 2007, which Perona did not discover until January 2, 2008; (3) the card reader data for plaintiff's arrivals during the nine-month period between March 2007 and January 2008 showed that she was late for work as many as twenty days each month; (4) in April 2007, plaintiff signed Perona's name to a document without authorization and received a one-day suspension for it; and (5) on January 2, 2008, when plaintiff asked for vacation time, Perona discovered that she had already taken more vacation days than she was allotted for the June 1, 2007-May 30, 2008 period. In short, the record does not support the inference that defendant criticized plaintiff's performance only after Kubiak was hired on January 15, 2008. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 14, 19-21, 24-30; Def.'s App., Tab G, Ex. 15, Email from Perona to Robinson (June 15, 2006); *id.*, Ex. 16, Robinson – Attendance Record 2007; *id.*, Ex. 37, 2006 Performance Evaluation; *id.*, Ex. 11, Memo from Perona to OIG Personnel File (Apr. 11, 2007).)

Plaintiff fares no better with her contention about discipline. Though the record shows that Sidrys signed attendance reports in Perona's absence and was not disciplined for doing so, it also shows that, unlike plaintiff, Sidrys signed his own name and, as Deputy IG, had the authority to do so. (*See* Pl.'s App., Tab C, Ex. 40, Biweekly Attendance Report – Pay Period 02/16/08; *id.*, Tab A, 9/26/08 Hr'g Tr. 145-47.) Similarly, viewed in plaintiff's favor, the record shows that defendant did not discipline white employees who requested more vacation days than they were allotted or submitted incorrect petty cash vouchers. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6, 16.) But, as plaintiff admits, it was "her function as the office administrator," not theirs, "[to] work[] with [employees] to let them know exactly what [leave time] they had left" and to ensure the accuracy of petty cash disbursements. (*Id.*, Tab B, 11/14/08 Hr'g Tr. 72-73, 93-94; *see* Pl.'s App., Tab C, Ex. 8, OIG

11

Administrative Policies & Procedures Manual CTA 000078-79.) Further, though the record shows that Kubiak was not disciplined for arriving at the OIG office after 8:00 a.m, it also shows that, unlike plaintiff, Kubiak did field work and was not instructed to be in the office at 8:00 a.m. (*See* Pl.'s LR 56.1(b)(3)(c) Stmt. ¶¶ 21-22; Pl.'s App., Tab B, 11/14/08 Hr'g Tr. 44-47, 52-55; *id.*, Tab A, 9/26/08 Hr'g Tr. 104-07.) Thus, these facts do not support the inference that defendant disciplined plaintiff or any other African-American employee more harshly than their white counterparts.

The record supports plaintiff's next assertion, that Perona initially gave no reason for the termination, but it does not suggest that the reasons she later gave were concocted. It is undisputed that, until HR told her otherwise, Perona thought plaintiff was an at-will employee who could be terminated without cause. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 55.) Moreover, the termination notice that Perona subsequently prepared cites conduct to which plaintiff admits or is documented by contemporaneously-created records. (*See* Pl.'s App., Tab C, Ex. 3, 3/26/08 Notice of Termination; *id.*, Ex. 10, Petty Cash Discrepancy – October 2005; *id.*, Ex. 11, Memo from Perona to Personnel File (Apr. 11, 2007); *id.*, Ex. 12, Memo from Perona to Personnel File (Jan. 16, 2008); *id.*, Ex. 20, Email from Perona to Robinson (Mar. 12, 2008); *id.*, Ex. 14, Memo from Perona to Robinson (Feb. 1, 2008); *id.*, Ex. 21, Email from Perona to Sidrys (Feb. 19, 2008); *id.*, Ex. 25, Email from Sidrys to Perona (Mar. 20, 2008); Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 8-9, 11, 19-21, 25-27, 34-41, 43, 46-47, 50-51.) Given that the undisputed evidence corroborates Perona's proffered reasons for the termination, her failure to provide them to plaintiff immediately does not suggest that they are false.

Plaintiff's next contention is that Kubiak replaced her. The parties agree that, as OIG's office administrator, plaintiff was responsible for: (1) new employee orientation, time-

keeping/payroll and employee benefits; (2) preparing and updating the office procedure handbook and maintaining the OIG policies and procedures manual agreement; (3) preparing requests for and arranging payments to outside contractors; (4) preparing the annual budget report, monitoring operating and capital expenditures and analyzing treasury department reports; (5) ordering, maintaining and handling payments for office supplies and equipment used by OIG; (6) coordinating meetings for the IG, handling travel authorizations and reimbursements and arranging for payment of seminar and training requests; and (7) developing, furnishing and maintaining office space. (Pl.'s App., Tab C, Ex. 8, OIG Administrative Policies & Procedures Manual CTA 000064; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 7.) They also agree that, after plaintiff's termination, Kubiak assumed responsibility for timekeeping/payroll, paying outside contractors and petty cash, Perona assumed responsibility for budgeting, and the chief investigator assumed responsibility for CTA-owned and rented vehicles used by OIG. (Pl.'s App., Tab A, 9/26/08 Hr'g Tr. 103, 154-56.) There is no evidence that indicates who in OIG, if anyone, assumed the remaining tasks. Thus, the record does not support the inference that Kubiak replaced plaintiff.

In sum, the record does not contain evidence from which defendant's discriminatory intent can be directly or indirectly inferred. Thus, defendant is entitled to judgment as a matter of law on plaintiff's discrimination claims.

**State Law Claims**

Having dismissed all of the federal claims in this suit, the Court declines to exercise supplemental jurisdiction over the state law claims plaintiff asserts in Counts III and IV. *See* 28 U.S.C. § 1367(c)(3).

## Conclusion

For the reasons set forth above, the Court finds that there is no genuine issue of material fact as to the federal claims plaintiff asserts in Counts I, II and V of the first amended complaint and thus, grants defendant's motion for summary judgment [32] as to those claims. The Court declines to exercise supplemental jurisdiction over the state law claims plaintiff asserts in Counts III and IV, which are dismissed without prejudice to filing in state court. This case is terminated.

**SO ORDERED.**                  **ENTER: December 6, 2011**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**